**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Hill-Rom Holdings, Inc.<br><br>     plaintiff,<br><br>– v –<br><br>Tom Brennan,<br><br>     defendant. | Case No.:  1:22-cv-3410<br><br><br>Jury Trial Demanded |

**VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff, Hill-Rom Holdings, Inc. ("Hillrom" or "Company"), by and through its undersigned attorneys, files this Verified Complaint for injunctive relief and damages against Tom Brennan ("Brennan") and alleges the following:

**I.     NATURE OF ACTION**

1.     Hillrom brings this action for damages and equitable relief for breach of contract against Brennan, who violated his employee Non-Solicitation and Non-Disclosure Agreement ("NSNDA"). Hillrom also brings claims against Brennan for misappropriation of trade secrets in violation of his confidentiality obligations outlined in his NSNDA.

2.     Hillrom hired Brennan in March 2020.

3.     As a condition of Brennan's employment with Hillrom, Brennan entered into an NSNDA. (*See* Exhibit A, NSNDA) Through the NSNDA, first, Brennan expressly consented to protect Hillrom's confidential and proprietary information by refraining from disclosing such information not only to himself, but also third parties. He also consented to return all of Hillrom's confidential and proprietary information upon his termination. Second, Brennan agreed that during

the term of his employment and for one year post-termination of employment, he would not solicit Hillrom customers he had served or otherwise had a relationship within the year preceding his termination of employment. Third, Brennan agreed that for one-year post-termination of employment, he would not solicit any Hillrom employees to leave employment with Hillrom.

4.      Brennan breached each of the three above-named contractual obligations to Hillrom. Specifically, records demonstrate that, during Brennan's employment and in contemplation of his resignation, Brennan forwarded confidential and proprietary information, including information about medical device products, sales productivity reports, prescriber lists, business strategies, plans, and notes to his personal email account. Additionally, Brennan violated his agreement not to solicit Hillrom customers by contacting, on information and belief, multiple Hillrom customers who are healthcare providers in the respiratory chronic illness and therapy sector who purchase certain Hillrom manufactured and sold medical devices within the same sales region in which Brennan provided medical device sales services on behalf of Hillrom to seek an unfair advantage for himself and others. Finally, Brennan, on information and belief, solicited a Hillrom employee to terminate his relationship with Hillrom and, seeking an unfair advantage for himself and others, invited him to work with Brennan at Community Surgical Supply ("CSS"). [1]

5.      Such conduct blatantly violates the contractual obligations Brennan owes to Hillrom. Consequently, Hillrom seeks monetary relief and equitable relief against Brennan for the breach of these contractual obligations.

## II.      **THE PARTIES**

6.      Hillrom is an Indiana corporation with its principal place of business at 1 Baxter Parkway, Deerfield, Illinois 60015.

---

[1] Community Surgical Supply is a subsidiary of AdaptHealth, which was acquired in December 2021.

DM_US 189210259-2.019455.0114

7.     On information and belief, Brennan is an individual who resides in Philadelphia, Pennsylvania.

## III.     JURISDICTION & VENUE

8.     The District Court has personal jurisdiction over Brennan because he specifically "acknowledge[d] and agree[d] that [he] has material connections with Illinois," and "consent[d] to any such court's exercise of personal jurisdiction over him" and further agreed that the terms of the NSNDA would be governed by the laws of the State of Illinois. (*See* Exhibit A, NSNDA, Section 17)

9.     The District Court has original jurisdiction over this action under 28 U.S.C. § 1331, as Hillrom's Defend Trade Secrets Act claim arises under federal law, specifically, 18 U.S.C. § 1836, *et seq*. Alternatively, independent subject matter jurisdiction exists under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Hillrom and Brennan are citizens of different states.

10.     Venue is proper in this Court because the NSNDA between the parties provides that the "exclusive venue for any litigation between [Brennan] and Company based upon any fact, matter or claim arising out of or relating to this Agreement shall be the state or federal courts located in Chicago, Illinois."

## IV.     FACTUAL ALLEGATIONS

### A.     Background regarding Hillrom and CSS's Business

11.     Hillrom is a medical device sales provider and a subsidiary of Baxter International, Inc. ("Baxter").   Baxter acquired Hillrom in December 2021. Hillrom specializes in the manufacture of medical device technologies and related products for the health care industry, including patient support systems, safe mobility and handling solutions, non-invasive therapeutic products, medical equipment rentals, surgical products, and information technology solutions.

3

Specifically, Hillrom brought to Baxter its respiratory health products for patients with symptoms associated with chronic obstructive pulmonary disease (COPD), cystic fibrosis (CF) and other pulmonary-compromising conditions. (Declaration of Jeremy Moore ("Moore Declaration"), ¶¶ 3-5, Exhibit B)

12.     Hillrom offers medical devices focused on therapy and treatment of chronic respiratory illnesses to provide patients products such as non-invasive ventilation products, which give patients the flexibility to move about freely during therapy. These products include, without limitation, the Life2000 Ventilator ("Life2000").[2] The Life2000 is a mask-free, portable, and non-invasive ventilator that helps patients receive breathing assistance at home and as they need to go about their daily activities. (Id. at ¶ 6)

13.     One of Hillrom's highly sought-after products is the Life2000. The Life2000 is an innovative global ventilator and is designed to keep patients ambulatory. It assists patients with chronic lung disease, who require large amounts of oxygen but cannot exhale enough carbon dioxide to properly ventilate lungs so that patients can remain up and about in their home. It is unique in the marketplace and currently, there is no product on the market that offers what Life2000 does. (Id. at ¶ 8)

14.     CSS is a Durable Medical Equipment ("DME") company that specializes in providing clinical equipment and supplies ordered and prescribed by healthcare providers for home care use to patients (for example, oxygen equipment, wheelchairs, ventilators, etc.). Unlike Hillrom, CSS is not the manufacturer of the medical equipment, but rather a distributor between

---

[2] Other competitive products provided by Baxter subsequent the acquisition of Hillrom include the *Volara*, an oscillation and lung expansion therapy tool that helps acute care patients breathe easier; *The Vest Airway Clearance System* – recognized as the "gold standard" in high frequency chest wall oscillation therapy and is designed to help patients mobilize secretions to assist in avoiding respiratory infections, hospitalizations and reduced lung function; and the *Monarch Airway Vest*, a high frequency chest wall oscillation therapy and airflow device that helps thin and move mucus from the small airways to the large airways, where it can be coughed out or suctioned. (Ex. B, *Moore Declaration* at ¶ 7)

4

the provider and the patient. Upon information and belief, after CSS fills the prescription for the medical equipment, and it then seeks reimbursement from the ultimate payor of the medical equipment (i.e., Medicare, Medicaid, or a commercial payor). (*Id*. at ¶ 19)

15.    Hillrom and CSS are direct competitors in the sale of at-home medical equipment therapy products as both companies regularly carry the same products.  At times, Hillrom will compete with CSS where CSS has contracted to sell a Hillrom manufactured product (such as the Life2000). (*Id*. at ¶22).

16.    Hillrom and CSS's business industry and products are highly sophisticated and require technical knowledge of the products. To ensure the success of its employees, Hillrom invests substantial time and financial resources in developing and training a network of Sales Area Vice Presidents and Account Executives to market, promote, and sell its medical device products, including the Life2000, throughout the industry. (*Id*. at ¶ 23) Through training, these professionals have developed significant knowledge of the respiratory and pulmonary therapy industry for chronic conditions.  (*Id*.)

17.    To protect its investments, as well as its confidential information and trade secret information, employees, and customer relationships from unfair competition, Hillrom employs multiple layers of security – from the infrastructure layer to employee computers – to protect all systems and data as appropriate. These security layers include, but are not limited to, anti-virus software, host-based and network intrusion detection systems, hardware and software firewalls, and encryption and application filters. (*Id*. at ¶ 17)

18.    Aside from technology-based security, Hillrom ensures its employees, including Brennan, enter into agreements, which address, among other things, the handling of confidential

and proprietary information, disclosure and reporting obligations, and the return of property and documents upon leaving Baxter and/or Hillrom. (*Id*. at ¶ 16)

19.    Upon information and belief, CSS utilizes similar restrictive covenants in its agreements with employees.

20.    Hillrom takes these measures, in part, to protect its business interests: if this information which is not publicly available, is stolen or otherwise used by someone who has intimate knowledge of Hillrom's customers, internal operations, and strategic business plans and is then disclosed to a competitor, Hillrom would be at a severe and irreparable competitive advantage. (*Id*. at ¶ 16)

**B.    Hillrom's Relationship with Brennan and Brennan's NSNDA**

21.    On or about December 12, 2012[3], Hillrom hired Brennan to perform various tasks for the Company as an Area Vice President for Respiratory Health ("Area VP") for the Northeast Region.[4] As Area VP, Brennan was responsible for managing a sales team of approximately eight (8) Account Executives[5] including developing them as sales leaders through coaching, development plans, and performance reviews. (*Id*. at ¶¶ 9, 12)

22.    As Northeast Area VP, Brennan was expected to develop and implement a sales strategy throughout the Northeast, the essence of which was to gain market share in the Northeast by developing and maintaining relationships with physicians and other prescribing clinicians, office staff, and hospital employees. (*Id*.) In doing so, Brennan had access to Hillrom's, and after

---

[3] To be clear, Brennan originally was hired by Breathe Technologies, Inc. which was later acquired by Hillrom in August 2019.

[4] The Northeast Region consists of the following states and territories: Connecticut, Eastern Pennsylvania (Allentown, Philadelphia, Scranton), Maine, Massachusetts, New Hampshire, New Jersey, New York City, Rhode Island, and Vermont.

[5] The Area VP also is responsible for managing two (2) Clinical Sales Specialists, whose roles are filled by licensed respiratory therapists and provide clinical expertise alongside the Account Executive when necessary. (Ex. B, *Moore Declaration* at ¶ 12, fn. 1).

the acquisition Baxter's, confidential, proprietary, and trade secret information, including customer/prescriber lists and sales data, prospective customer/prescriber strategies, pricing, and business strategies. (*Id*. at ¶ 13).

23.    Put simply, Brennan was responsible for selling Hillrom medical equipment including the *Volara*, *The Vest*, *Monarch Airway Vest,* and *Life2000*. (*Id*. at ¶ 14) To achieve this objective, Hillrom provides its Area VPs, including Brennan, with access to customer lists, provider registration and license numbers (NPIs), provider decile rankings[6], historic prescribing practices of the *Life2000*, patient information, and institutional knowledge of the Northeast sales team's successes and failures. (*Id*. at ¶ 14)

24.    Not only does Hillrom provide its Area VPs with institutional knowledge and access to confidential information and trade secrets, but it also provides substantial financial support to grow their skills and customer base. For example, Hillrom provides its Area VPs with budgets and reimbursement to entertain current and prospective customers, grow their sales acumen through attending various conferences across the U.S., and sponsor events to bring in new business or demonstrate new product lines. (*Id*. at ¶ 15)

25.    Accordingly, to protect its legitimate business interests, Hillrom required that Brennan agree to the Hillrom NSNDA as a condition of employment.   The NSNDA contains certain reasonable restrictive covenants and confidentiality obligations.   (*Id*. at ¶ 16)

26.    First, Brennan agreed to the following non-solicitation covenants:

> For the one (1) year period following the termination of [Brennan's] employment with the Company, [Brennan] shall not, directly or indirectly, (for [Brennan] or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity), for the purpose of providing products or services

---

[6] The "decile" ranking is a system of ranking providers based on their diagnosing and/or prescribing behavior. It is a private subscription service only available through the Centers for Medicare & Medicaid Services. The purpose of access and use of provider's decile ranking is to target those providers who treat and diagnose individuals with CF or COPD, or other respiratory chronic illnesses that would most likely prescribe devices such as the *Life2000* to patients.

competitive with those conducted, authorized, offered for provided by the Company, solicit, market, service, contact, sell to or attempt to sell to any Person(s):

(1) to whom [Brennan] sold products or services on behalf of the Company at any time during the Pre-Termination Period, including sales performed while [Brennan] was in training or providing vacation or leave coverage for another employee; or

(2) to whom the Company sold products or services and with whom [Brennan] had contact on behalf of the Company in connection with such sale at any time during the Pre-termination Period; or

(3) to whom the Company sold products or services at any time during the Pre-Termination Period and which sale was made through any employee whom [Brennan] managed or supervised (at any level of management or supervision);

(4) with regard to whom, at any time during the Pre-Termination Period, [Brennan] (or any employee whom [Brennan] managed or supervised, at any level of management or supervision); (i) participated n the preparation of a written sales proposal or bid containing Confidential Information to such Person on behalf of the Company; (ii) participated in the setting of prices, margins, or credit terms for such Person(s) on behalf of the Company; or (iii) used or received or created or reviewed any Confidential Information relating to such Person(s) on behalf of the Company; or

(5) who is, or functions as, a medical device broker, IDN, or contract management company or group purchasing organization or otherwise represents one or more customers or negotiates on their behalf, and to whom or through whom [Brennan] or any employee whom [Brennan] managed or supervised (at any level of management or supervision) sold products or services on behalf of the Company at any time during the Pre-Termination Period.

(Ex. A, NSNDA, section 6(a)(1)-(5)).

27.     Brennan also agreed not to solicit Hillrom employees:

For a period of one (1) year following [Brennan's] termination of employment with the Company, [Brennan] will not, directly or indirectly, on behalf of [Brennan] or for any other Person, entice, induce, encourage or solicit or attempt to entice, induce, encourage or solicit **any employee** [. . .] **then employed or engaged by the Company and with whom [Brennan] had work-related dealings on behalf of or through the Company to terminate such employee's** [. . .] **employment or engagement with the Company** (this provision is not intended to restrict communications addressed to the general public, such as advertising to dill open

8

positions) **nor will [Brennan] hire any such individual for any other Person during the same one-year period following [Brennan's] termination**.

(Ex. A, NSNDA, section 7) (emphasis added)

28.    Similarly, Brenan agreed, that "at no time, either during or after [his] termination of employment, shall [he] directly or indirectly obtain, disclose or use for [him] or any other Person, or aid others in obtaining, disclosing or using, any Confidential Information of the Company." (Ex. A, NSNDA, section 3(a))

29.    The NSDA defines "Confidential Information" as including "any information … relating to the Business of the Company" including but not limited to:

- customer and vendor documents and files;

- information pertaining to the Company's methods of operation, process, strategies and techniques;

- concepts, ideas, discoveries, improvement, designs, developments, research, drawings, plans, methods, systems, specifications, data, including all notes, compilations, adaptations, summaries and the like prepared by [Brennan] or others;

- personnel information about other employees of the Company if derived from confidential Company files including job performance which is not generally known, or readily available by lawful means, to the public;

- strategies, processes, concepts, data, documents, financial figures, specifications, and/or other information regarding healthcare products;

(Ex. A, NSNDA, section 2(f))

30.    Brennan also agreed that, "[u]pon termination of [his] employment, [he] shall return to the Company all Property of the Company and all copies thereof in [his] possession or control, in all formats (whether tangible, electronic, or otherwise), including all Confidential Information, documents, copies, papers, […], notes, […], and other material in [his] possession or under [his]

9

control that relate to the Company's business and that [he] obtained in connection with employment with the Company."[7] (Ex. A, NSNDA, section 4).

### C. Brennan Resigns from Hillrom and Violates His NSNDA

31.    In early February 2022, Brennan notified his direct supervisor—Jeremy Moore ("Moore"), Hillrom's Regional Vice President for Respiratory Health Division—of his intent to resign from employment with Hillrom. (Ex. B, *Moore Declaration*, ¶ 18).

32.    Brennan notified Moore that he would be joining AdaptHealth – not CSS – for a financially lucrative opportunity to work on "special projects" including work on products that would be "innovative, new to market, and cutting edge." Brennan represented to Hillrom that he would not be working in a position that involves responsibility over any business with which Hillrom and/or Baxter competes, as defined under his NSNDA. (*Id*. at ¶¶ 18-19)

33.    CSS is a direct competitor of Hillrom in the respiratory medical device sales space, and specifically with the sale of the Life2000. (*Id*. at ¶ 20)

34.    Brennan officially resigned on February 7, 2022, and his final day at Hillrom was February 28, 2022. (*Id*. at ¶¶ 18, 25)

#### 1.    Brennan Sends Company Property to Personal Email

35.    On or about June 10, 2022, Hillrom reviewed Brennan's Company issued computer-mail account to determine whether he e-mailed and was in possession of any Baxter or Hillrom confidential information or property prior to his final day of employment. (Declaration of Amy Hammerle ("*Hammerle Declaration*"), ¶ 3, Exhibit C).  Hillrom subsequently used curated

---

[7] "Property" means all records, files, pricelists, photo/videographic materials, computers and computer related equipment, cell phones, smart phones, tablets, personal data assistants, keys, equipment, access cards, passwords, access codes, badges, credit cards or other tangible material, and all other documents, including but not limited to Confidential Information received, acquired, produced or accessed as a result of an employee's employment with the Company.

DM_US 189210259-2.019455.0114

search terms to determine whether Brennan was in possession of any Confidential Information or Hillrom property. (*Id*. at ¶¶ 3-4).

36.     Hillrom learned that during January and February 2022—*i.e.* shortly before and after Brennan accepted his January 13 offer from CSS—Brennan sent multiple emails with Company Confidential Information to his personal email account, including PowerPoints related to new technology, business plans, quarterly reviews of account executives' sales productivity, prescription data, and top prescriber lists. (*Id*. at ¶¶ 5-9)

37.     For example, Brennan forwarded a FY22 Area Vice President Business Plan to his personal email containing detailed performance summaries, strategic opportunities, team performance data with individual Hillrom employee names. (*Id*. at ¶ 6)

### 2.     Brennan's Solicitation Activity

38.     On multiple occasions, Hillrom has learned that Brennan has been proactively and directly soliciting Hillrom customers to directly compete against products in the Hillrom portfolio, specifically the Life2000, which was the product over which Brennan had responsibility in his role as Northeast Area VP. (Ex. B, *Moore Declaration*, ¶ 26)

39.     *First*, a Hillrom Account Executive servicing the Philadelphia and southern New Jersey area learned from customer Dr. David Paul Visco (Vineland, NJ) that a CSS surgical representative visited his clinic in early April 2022 and notified him "I have good news, Tom Brennan is now with [CSS] and he's focusing on Life2000." (*Id*. at ¶ 27)

40.     Upon hearing this, the Account Executive called Brennan directly and shared concern that he was hearing Brennan's name involved in competing directly for Hillrom's business. (*Id*. at ¶ 28).

41.     *Second*, on or about April 29, 2022, Hillrom learned from a former senior Account Executive that current Hillrom customer Pulmonary Intensive Care Specialists (located in

DM_US 189210259-2.019455.0114

Brunswick, NJ) recently had contact with Brennan for a customer visit. Brennan was representing CSS and specifically referenced earning Pulmonary Intensive Care Specialists' *Life2000* business. On information and belief, Brennan stated to the former senior Account Executive that she "was no longer [Pulmonary Intensive Care Specialists'] rep." (*Id*. at ¶ 29)

42.     Upon information and belief, Brennan's objective in notifying Pulmonary Intensive Care Specialists that they no longer had the same Hillrom Account Executive was to imply that Brennan and CSS would now be handling the business related to Pulmonary Intensive Care Specialists. (*Id*. at ¶ 30)

43.     Another example occurred on May 10, 2022, when a Hillrom Account Executive heard from two different customers (1) Nassau Chest Physicians, P.C. and (2) Klapper Deluca Pulmonary Associates, P.C (Long Island, NY) that approximately 2 weeks prior, their CSS representatives have begun targeting *Life2000* business. (*Id*. at ¶ 31)

44.     Importantly, Brennan was heavily involved in developing Hillrom's sales to Klapper Deluca Pulmonary Associates, P.C. and its *Life2000* business. (*Id*.)

45.     Hillrom also learned that per the activity above and Brennan's CSS offer letter, Brennan's actual role at CSS was not to work on "special projects" as he misrepresented when leaving the Company, but rather Brennan is a Director of Sales at CSS. (*Id*. at ¶ 21); *see also* Exhibit D, CSS Offer Letter)

46.     On June 3, 2022, a Hillrom Account Executive notified Moore that Brennan had dinner with Hillrom's customer Dr. Allen Silvey (Cape May, NJ) the week before. (*Id*. at ¶ 32).

47.     Upon information and belief, a former Northeast Region Account Executive, Anthony Ngo, also left shortly after Brennan to join AdaptHealth and/or CSS to work on "special projects". (Ex. B, *Moore Declaration,* ¶ 33).

12

48.     On May 19, 2022, Baxter sent Brennan and AdaptHealth's General Counsel a letter informing Brennan of his continuing restrictive covenant obligations and its understanding of his breach of the same. (Exhibit E, May 19, 2022, Cease & Desist Letter; see also Ex. B, *Moore Declaration*, ¶ 34). Hillrom did not receive a response.

49.     On June 14, 2022, Hillrom's counsel again sent AdaptHealth the same May 19 Cease & Desist letter. Hillrom did not receive a response.

50.     On June 24, 2022, Hillrom's counsel again contacted Brennan with the May 19 letter. Brennan still has not responded.

## V.     CAUSES OF ACTION

### COUNT I
### (Breach of Contract – Non-Solicitation)

51.     Hillrom incorporates and re-alleges the previous paragraphs as if fully set forth herein.

52.     On March 22, 2020, Brennan entered into a valid, enforceable, and binding NSNDA.

53.     Brennan entered his NSDA for good and valuable consideration, including but not limited to, employment with Hillrom, access to Hillrom relationships and confidential information, and the ability to participate in Hillrom's incentive compensation plan and Hillrom stock incentive plan. (Ex. A, NSNDA, Section 1(a))

54.     Hillrom has fulfilled its obligations under the NSNDA.

55.     Upon information and belief, Brennan breached the NSNDA by, among other things, directly and/or indirectly soliciting Hillrom customers to cease doing business with Hillrom in favor of becoming a customer of CSS.

56.     Upon information and belief, Brennan breached his NSNDA by, among other things, soliciting or inducing former employee Anthony Ngo to leave employment with Hillrom in favor of gaining employment at CSS.

57.     As a result of Brennan's breach of his NSNDA, Hillrom has suffered significant harm including, but not limited to, lost business from customers, interference with Hillrom's business operations, the need to replace employees in Hillrom's Northeast sales region, time and costs in reassuring customers their accounts are secure at Hillrom, and damage to Hillrom's reputation with its customers and facilities at which Brennan worked. Hillrom has also had to retain the undersigned counsel and incur reasonable attorneys' fees to bring this action.

WHEREFORE, Hillrom is entitled to relief and judgment against Brennan in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## COUNT II
### (Breach of Contract – Disclosure of Confidential Information)

58.     Hillrom incorporates and re-alleges the previous paragraphs as if fully set forth herein.

59.     At all times during his employment with Hillrom, Brennan owed a contractual duty to maintain as secret and confidential all Confidential Information as defined in his NSNDA.

60.     At all times during his employment with Hillrom, Brennan owed a contractual duty that he would not, directly or indirectly, disclose or use to himself or any other person any Confidential Information.

61.     Brennan's duty and obligation to maintain as secret and confidential all Confidential Information and covenant not to disclose any Confidential Information survived his termination from Hillrom.

14

62.     Upon information and belief, while employed at Hillrom, Brennan breached his contractual duty to maintain and not disclose Hillrom's Confidential Information by, among other things, misappropriating and misusing Hillrom's Confidential Information related to business plans, products, confidential employee information (including percentages of Account Executives' productivity), and customer information related to Hillrom's current customers.

63.     As a result of Brennan's breach of his NSNDA, Hillrom has suffered significant harm including, but not limited to, lost business, interference with Hillrom's business operations, the need to replace employees in Hillrom's Northeast sales region, time, and costs in reassuring customers their accounts are secure at Hillrom, and damage to Hillrom's reputation with its customers and facilities at which Brennan worked. Hillrom has also had to retain the undersigned counsel and incur reasonable attorneys' fees to bring this action.

WHEREFORE, Hillrom is entitled to relief and judgment against Brennan in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## COUNT III
### (Breach of Contract – Failure to Return Company Property)

64.     Hillrom incorporates and re-alleges the previous paragraphs as if fully set forth herein.

65.     At all times during his employment with Hillrom, Brennan owed a contractual duty to return all Company Property, including copies in his possession and control, upon termination of his employment with Hillrom.

66.     While employed at Hillrom, Brennan transmitted certain Confidential Information to his personal email throughout January and February of 2022.

15

67.     Brennan breached his contractual duty to return all Company Property upon termination, including copies thereof.

68.     As a result of Brennan's breach of his NSNDA, Hillrom has suffered significant harm including, but not limited to, lost business, interference with Hillrom's business operations, the need to replace employees in Hillrom's Northeast sales region, time, and costs in reassuring customers their accounts are secure at Hillrom, and damage to Hillrom's reputation with its customers and facilities at which Brennan worked. Hillrom has also had to retain the undersigned counsel and incur reasonable attorneys' fees to bring this action.

WHEREFORE, Hillrom is entitled to relief and judgment against Brennan in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## COUNT IV
**(Misappropriation of Trade Secrets in Violation of the Illinois Trade Secrets Act)**

69.     Hillrom incorporates and re-alleges the previous paragraphs as if fully set forth herein.

70.     Brennan had access to Hillrom's Confidential Information while working for Hillrom, including its customer lists and data, prospective customer strategies, business strategies, prescriber/provider lists, detailed information regarding the Life2000 and its historic success, and other trade secrets. He likewise had access to Hillrom's marketing strategies and proprietary sales information. This information was developed over the course of many years, and Hillrom spent considerable time, energy, and resources doing so. In fact, Hillrom has invested a substantial amount of money to purchase customer lists and prescriber data from third-party vendors, such as the Centers for Medicare & Medicaid Services, which is non-public and highly desirable.

16

71.     This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS 1065/1, *et seq*., because Hillrom derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

72.     Hillrom has taken reasonable measures to keep this information secret and confidential and out of the hands of its competitors, including by limiting access to its trade secret information, entering into confidential agreements with Brennan and other employees, training employees on their confidentiality and security obligations, and encrypting employees' laptops and work devices.

73.     Brennan had (and has) duties not to misappropriate Hillrom's Confidential Information, including its trade secrets, or to disclose such information outside of Hillrom. The NSNDA is an enforceable agreement that imposes on Brennan contractual obligations, including reasonable and necessary obligations of nondisclosure with respect to Hillrom trade secrets.

74.     Brennan misappropriated, threatened to misappropriate, and/or will inevitably disclose Hillrom's trade secrets without its consent, in violation of Illinois law. Brennan cannot maintain similar and/or identical relationships with Hillrom customers without inevitably utilizing and disclosing Hillrom's confidential and trade secret information.

75.     Specifically, as discussed above, Brennan sent to himself and is using and disclosing, or will use and disclose, Hillrom's trade secrets relating to, at a minimum, Hillrom's Northeast business strategy and plans and certain prescriber location information in the respiratory health medical equipment industry for which CCS is a direct competitor, to unfairly compete

17

against Hillrom. Brennan knows or should know that the information that he improperly disclosed and is using are Hillrom's trade secrets.

76.     Brennan's actions are willful and malicious.

77.     Brennan is or will be unjustly enriched by his misappropriation of Hillrom's trade secrets and, unless restrained, Brennan will continue to use, divulge, and otherwise misappropriate Hillrom's trade secrets and confidential information.

78.     Because of the actual misappropriation of Hillrom's trade secrets, Hillrom has been injured and faces irreparable injury. In addition to remedy at equity, Hillrom seeks actual, incidental, compensatory, punitive, consequential damages, and attorneys' fees and costs.

79.     As a result of Brennan's misappropriation of trade secrets, Hillrom has suffered significant harm including, but not limited to, lost business, interference with Hillrom's business operations, the need to replace employees in Hillrom's Northeast sales region, time and costs in reassuring customers their accounts are secure at Hillrom, and damage to Hillrom's reputation with its customers and facilities at which Brennan worked. Hillrom has also had to retain the undersigned counsel and incur reasonable attorneys' fees to bring this action.

WHEREFORE, Hillrom is entitled to relief and judgment against Brennan in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## COUNT V
**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act)**

80.     Hillrom incorporates and re-alleges the previous paragraphs as if fully set forth herein.

81. The Defend Trade Secrets Act ("DTSA") defines "trade secret" to include all forms and types of financial, business or economic information, including patters, plans, compilations, methods, techni1ues, processes, procedures or programs, if (A) the owner thereof has taken reasonable measure to keep such information secret; (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. (*See* 18 U.S.C. §§ 1836, 1839)

82. Brennan acquired an/or is using Hillrom's trade secrets by improper means and without authorization. In particular, Brennan obtained trade secrets from Hillrom through having accessed and retained Hillrom's confidential information and trade secrets but failing to return and cease using that information upon the termination of his employment with Hillrom.

83. The information Brennan provided to his personal email address, described above, constitutes trade secrets within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

84. As stated above, Hillrom takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

85. Brennan knew or should have known that Hillrom's trade secrets: (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Hillrom at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Hillrom's competitors; (e) would provide significant benefit to a competitor seeking to compete with Hillrom; and (f) are critical to Hillrom's ability to conduct its business successfully.

DM_US 189210259-2.019455.0114

86.     Brennan transferred and/or wrongfully obtained and accessed Hillrom's trade secrets and failed to return Hillrom's information, despite contractual obligations to return such information.

87.     By disclosing and/or threatening to disclose and use Hillrom's trade secrets, Brennan has misappropriated or threatens to misappropriate Hillrom's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

88.     The information that Brennan has misappropriated or threatens to misappropriate relates to Hillrom's highly confidential business relationships and strategic plans, which involve products that are sold in, utilized throughout, and/or travel through interstate commerce.

89.     Should Brennan continue to disclose or threaten to disclose Hillrom's trade secrets, the disclosure of such information will harm and/or threaten to harm Hillrom and its legitimate business interests.

90.     Brennan's actions were willful and malicious.

91.     If information pertaining to Hillrom's trade secrets are disclosed or further used by Brennan, it could destroy Hillrom's competitive advantage.

92.     Because Brennan's misconduct is ongoing and it poses a threat of significant irreparable harm that cannot be compensated by money alone, Hillrom requests that this Court grant injunctive relief against Brennan from actual or threatened disclosure or utilization of Hillrom's trade secrets, in addition to granting Hillrom judgment against Brennan in a sum to be proven at trial, plus interest, attorneys' fees, costs, and such other relief as this Court deems just and equitable.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Hillrom prays for the following relief:

20

a) Judgment in favor of Hillrom against Brennan for Counts I through V herein and an award to be proven at trial;

b) An award of damages (compensatory, exemplary, or otherwise) in an amount to be determined at trial as a result of Brennan's breaches of contract;

c) Equitable relief: (i) ensuring that Brennan does not continue to retain, use, or disclose any of Hillrom's confidential information; (ii) ordering that Brennan not solicit customers of Hillrom in violation of the NSNDA; (iii) ordering that Brennan not solicit Hillrom employees to leave Hillrom to join Brennan at CSS in violation of the NSNDA; (iv) ordering that Brennan not solicit customers within the Northeast region in which Brennan had provided medical device sales on behalf of Hillrom in violation of the NSNDA; and (v) granting restitution and/or unjust enrichment;

d) An award of attorneys' fees, costs, and expenses incurred as a result of the action;

e) A trial by jury as to all issues properly tried to a jury; and

f) Such further and other legal and equitable relief as the Court may deem just and necessary under the circumstances.

Dated: June 29, 2022

Respectfully submitted,

*/s/ Brian A. Mead*
Brian A. Mead (bmead@mwe.com)
Dawn M. Peacock (dpeacock@mwe.com)
McDermott Will & Emery, LLP
444 West Lake Street, Suite 4000
Chicago, IL 60606
Phone: (312) 372-2000

## **VERIFICATION**

I, Jeremy Moore, as Regional Vice President of Sales for Respiratory Health Division of Hillrom, hereby declare under penalty of perjury that I have read the foregoing **Verified Complaint**, and that I know the allegations set forth therein to be true, except those made on information and belief, as to which I believe them to be true to the best of my knowledge, information and belief.

Dated this 29th day of June, 2022.

*/s/ Jeremy Moore*
Jeremy Moore
Regional Vice President
Northeast Region

21

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned attorney certifies that on or about June 29, 2022, the Verified Complaint for Injunctive Relief and Damages will be served upon the below individual via both email communication and physical delivery:

Tom Brennan
32 Langston Lane
Media, PA 19063
tjjb32@outlook.com

*/s/ Dawn A. Peacock*

22